*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | | |
|---|---|---|
| *UNITED STATES OF AMERICA* | ) | |
| | ) | |
| *v.* | ) | *No. 2:13-cr-193-GZS* |
| | ) | |
| *LAMAR YOUNG,* | ) | |
| | ) | |
| *Defendant* | ) | |

### RECOMMENDED DECISION ON MOTION TO SUPPRESS AND MOTIONS TO DISMISS AND MEMORANDUM DECISION AND ORDER ON MOTIONS TO SEVER AND FOR BILL OF PARTICULARS

Defendant Lamar Young, charged with conspiring to distribute, and possess with intent to distribute, cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 846, subjecting him to the penalty provisions of 21 U.S.C. § 841(b)(1)(B) (Count One), distributing and aiding and abetting the distribution of cocaine base, commonly known as "crack," in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2 (Count Six), possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Count Seven), possession with intent to distribute cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) (Count Eight), and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A) (Count Nine), *see* Second Superseding Indictment (ECF No. 116) at 1-2, 4-6, moves to suppress evidence seized and statements made at the time of his arrest on March 11, 2014, at the Lewiston, Maine, apartment of his girlfriend, Jennifer Coleman, as well as all fruits of those seizures and statements, *see* Defendant's Motion To Suppress Fruits of Search or Interrogation and All Post Arrest Statements of Mr. Young ("Motion To Suppress") (ECF No. 112) at 1.

In addition, the defendant moves to dismiss Counts One and Six on the insufficiency of the Superseding Indictment (ECF No. 76), *see* Defendant Young's Motion To Dismiss for Insufficiency of the Superseding Indictment ("Motion/Insufficiency") (ECF No. 110) at 1, and Count One on the basis that 21 U.S.C. § 841(b)(1)(B) is unconstitutional on its face and as applied, *see* Defendant's Motion To Dismiss Based on Unconstitutionality of Statute ("Motion/Unconstitutionality") (ECF No. 109) at 1, for separate trials on the charges against him in both the Superseding Indictment and the Second Superseding Indictment and severance of his trial from those of his co-defendants, *see* Defendant's Motion To Sever ("First Motion To Sever") (ECF No. 111) at 1; Defendant Young's Motion To Sever with Respect to Second Superseding Indictment ("Second Motion To Sever") (ECF No. 172) at 1, and for a bill of particulars, *see* Defendant's Motion for Bill of Particulars ("Particulars Motion") (ECF No. 108).[1]

An evidentiary hearing was held before me on the Motion To Suppress on June 25, 2014, and July 15, 2014, during which the defendant appeared with counsel, each side presented three witnesses, the government offered four exhibits, all of which were admitted without objection, and the defendant offered nine exhibits, one of which was admitted over objection and the rest of which were admitted without objection. On August 1, 2014, I heard oral argument on all of the

---

[1] All of the pending motions, save for the Second Motion To Sever, were filed before the grand jury handed down the Second Superseding Indictment. I granted a motion by the defendant to treat all motions save for the First Motion To Sever as applicable to the Second Superseding Indictment. *See* ECF Nos. 173, 174. In the Second Superseding Indictment, the grand jury added three counts (Counts Seven through Nine) and a forfeiture allegation against the defendant. *Compare* Superseding Indictment *with* Second Superseding Indictment. Counts One and Six are identical in both indictments. *Id.* The defendant takes the position that the filing of the later indictment did not moot the prior ones. *See, e.g.*, First Motion To Sever at 1, 7 (requesting that co-defendants be separately tried not only on the Superseding Indictment but also on the initial Indictment, or that the initial Indictment be dismissed if the government has no intention of going forward on it). During oral argument, counsel for the government stated that the government intends to dismiss both the initial Indictment (ECF No. 3), which does not name the defendant, and the Superseding Indictment. However, the government has not as yet moved to do so. Therefore, my recommended and memorandum decisions apply to all versions of the indictment, to the extent relevant to the defendants' motions.

pending motions and granted the government's request for an opportunity to provide post-hearing briefing, limited to the submission on August 6, 2014, of simultaneous briefs with no response, on the subject matter of the validity, pursuant to the Fourth Amendment, of officers' initial entry into the Coleman apartment to effectuate a warrant for the defendant's arrest. On August 6, 2014, the parties filed post-hearing briefs. *See* Defendant Young's Post-Hearing Memorandum in Support of His Motion To Suppress Fruits of Search or Interrogation and All Post Arrest [sic] ("Defendant's Post-Hearing Brief") (ECF No. 207); Government's Supplemental Memorandum with Respect to Motion To Suppress ("Government's Post-Hearing Brief") (ECF No. 208). Following further motion practice, *see* ECF Nos. 210, 211, 212, 216, 220, 221, I permitted the defendant to file a responsive brief, *see* Defendant Young's Response to Government Post-Hearing Memorandum Regarding Suppression ("Defendant's Post-Hearing Response") (ECF No. 209).

For the reasons that follow, I recommend that the Motion To Suppress be granted in part, with respect to all statements made by the defendant on March 11, 2014, other than his initial statement, and otherwise denied, and that the motions to dismiss be denied, and I deem the motions to sever moot in part, to the extent that the defendant seeks severance of his trial from those of his co-defendants, and otherwise deny them, and deny the motion for a bill of particulars.

## I.   Motion To Suppress

### A.  Proposed Findings of Fact

On the evening of March 11, 2014, a group of six law enforcement officers set out to execute a warrant for the arrest of the defendant that had been issued by this court earlier that day. The group comprised Lewiston police officer Ryan Rawstron, who was assigned as a task

force officer to the United States Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), Maine State Police Trooper Thomas Pappas, who was assigned to the Maine Drug Enforcement Agency ("MDEA"), Lewiston police officer and MDEA task force officer Tyler Michaud, Lewiston police officer Joey Brown, Auburn police officer Dave Madore, and Maine State Police Trooper Kevin Rooney.

The officers went to four Lewiston addresses. They stopped first at the Howe Street apartment of Kayla Davidson, whom Rawstron had interviewed shortly before March 11. During that interview, Davidson had informed him that she had been dating the defendant for a little over a month, that he had previously stayed with her and Stephanie Webster at an apartment on Ash Street, that she had given her a firearm that officers seized from her at the time of the interview, and that he had a black firearm. Michaud also knew that the defendant had a connection to the Howe Street address and that officers had located him there during a previous investigation.

Neither Davidson nor the defendant was at the Howe Street apartment. However, officers spoke with someone (unidentified at the suppression hearing) who suggested that they try Webster's Ash Street apartment. They did so, but the defendant was not there.[2] They then went to the Horton Street address of a woman named Crystal, another woman with whom they had information that the defendant had been staying. Some of the officers were familiar with that address and with Crystal because they had supervised a controlled drug purchase and executed a search warrant there. Crystal was present, along with an individual whom she said she was dating, but not the defendant.

---

[2] Rawstron testified that officers met with Webster and went with her to the Ash Street apartment, but he also stated that, on the night of March 11, they did not find Webster there. It is unclear whether Webster accompanied officers to her apartment at Ash Street that night. However, the ambiguity is immaterial.

The officers returned to the Howe Street apartment, where they found and spoke with Webster. She informed them that if the defendant was not at her apartment on Ash Street or the Howe Street or Horton Street apartments, he had to be back with his former girlfriend "Jen" on Walnut Street. She stated that the defendant had been staying with Jen a couple of nights here and there when he was not with Davidson. Webster did not know the address on Walnut Street but described the apartment building. In exchange for this information, the officers did not take her to jail that night on outstanding fines, fees, and warrants and permitted her to turn herself in the following day.

At about 11:00 p.m., the officers went to Walnut Street and located the three-unit apartment building described by Webster. Rawstron recognized a vehicle parked outside as that of Jennifer Coleman, whom he knew, from a prior investigation, had previously lived with the defendant in an apartment on Tampa Street in Lewiston. Michaud also knew, from a prior investigation, that Coleman had a longstanding off-again, on-again relationship with the defendant and that the two had lived together at the Tampa Street address.

Four officers guarded the exterior of the apartment building, with Michaud and Brown stationing themselves at the front near a fire escape and Rooney and Madore at the rear. Rooney was assisted in this task by a police dog. Rawstron and Pappas, who were armed and clad in jeans, t-shirts, and bulletproof vests emblazoned with the word "police," went to a back door and ascended three flights of stairs that led to the door of Coleman's third-floor apartment. At about the same time as Rawstron and Pappas went inside the apartment building, Michaud observed one of the front window blinds being lifted, saw the defendant look out, and then saw the blinds close.

Rawstron and Pappas took a moment to position themselves because they thought that the defendant was possibly armed and dangerous. There was a small landing to the right of the top stair, about eight inches wide, too narrow for the officers to stand on with their police gear. Rawstron, who was in front, knocked on Coleman's apartment door as he stood on the stairs. Pappas stood behind him, three or four steps down, head level with the door jamb. Rawstron heard someone inquire who was there. Per his usual practice, he did not respond. After about a minute, an individual who appeared to Rawstron to be a teenage girl opened the door. She was in fact Coleman's oldest child, 22-year-old Saydi Brown. Rawstron inquired where Jen was and started to ask whether "Dash" (the defendant) was there but saw Coleman coming down a hallway. Coleman had been lying in bed in her bedroom at the opposite end of the hallway, which ran the length of the apartment, when she heard Saydi call out that the police were there. She had put on some pants and begun walking down the hallway toward the front door.[3]

Within a matter of seconds, Coleman reached the officers. By that time, Rawstron had moved just beyond the entry threshold, and Pappas had moved up to the threshold, where he could begin to scan the interior of the hallway. Rawstron asked Coleman who was there. She responded that she and her kids were. He asked who else, and she told them that Dash was there. Rawstron told her that he needed to speak with him and walked past her down the hallway, followed by Pappas. Both drew their firearms. Rawstron also carried a flashlight. Neither

---

[3] The Coleman apartment consists of a central hallway with a bedroom at each end and doors leading into the remaining rooms on both sides. The bedroom of Coleman's daughters, Saydi Brown and Ravon Palmer, is at the end of the hall closest to the front door, and Coleman's bedroom is at the opposite end. On the right side of the hallway, if one faces Coleman's bedroom, are doors leading first to the kitchen and then to the dining room/living room, and on the left side are doors leading first to the bedroom of Coleman's teenage son, Curtis, then to a bathroom, and then to the bedroom of her four-year-old son, Keen.

Rawstron nor Pappas asked for or received Saydi's or Coleman's permission to enter.  Coleman did not voice any objection to their entry.[4]

Rawstron pushed aside a curtain that was covering Coleman's bedroom door and saw a man whom he recognized as the defendant kneeling on the bed, his hands underneath the blankets.  Rawstron shone his flashlight and pointed his firearm at the defendant and ordered him to show him his hands.  Pappas, who was a couple of steps behind Rawstron, pointed his firearm at the defendant, as well.  The defendant complied.  Rawstron holstered his weapon, took the defendant's right arm, and ordered him to step away from the bed.  The defendant did so.

---

[4] The account given by the defendant's witnesses (Coleman, Saydi, and Ravon) of officers' entry into the Coleman apartment differed in significant respects from that given by the government's witnesses (Rawstron, Pappas, and Michaud).  Saydi testified that, when she opened the door, an officer whom she identified as Pappas pointed a gun in her face, asked who was there, and walked past her as she was answering the question, followed by a bald officer whom she could not identify and an officer whom she identified as Michaud.  She stated that the officers walked far enough down the hall to meet her mother in the vicinity of the bathroom.  She testified that the bald officer then directed her to go to the kitchen.  Ravon testified that she was texting on her cell phone in her bedroom with her bedroom door open a crack when Saydi opened the front door.  She stated that she heard officers say, "Move," and ask Saydi who was there, and that an officer then opened her bedroom door, shone a flashlight on her, and ordered her to put down her phone and go the kitchen.  She stated that initially four or five officers entered the apartment, although more later came and went, and that the initial conversation between her mother and the officers took place in the hallway near the door to the dining room/living room.  Coleman testified that as she started down the hallway she saw the police coming toward her, and they met and conversed near the door to the dining room/living room, after which she was directed to go to the kitchen, where her four children had already gathered.  She stated that two officers went down the hallway toward her bedroom while one remained with her and her children.  At oral argument, the defendant's counsel contended that the testimony that an officer pointed a gun in Saydi's face and that the officers moved past her and down the hallway was credible given the fact that they had been to three other places searching for the defendant, who could have been tipped off that they were on their way, and they did not know who was going to answer the door.  He argued that the defendants' evidence, including photographs, undermined the credibility of Rawstron's testimony that he could see Coleman coming down the hallway as he waited at the door, because, from that vantage point, one's view of the hallway is blocked by the kitchen wall, which curves from the doorway to the main part of the hall.  *See* Dft's Exhs. 5-6.  The government's counsel, on the other hand, argued that it did not make sense that officers would charge in and rush down the hall without confirmation that the defendant was present.  He took the position that it would have been reasonable for officers to take a step or two over the front door threshold when talking to Saydi, at which point one can see down the hallway.  I credit the testimony of the officers on these points.  Precisely because this was a potentially dangerous situation, and someone might have tipped the defendant off to their imminent arrival, it would not have made sense for the only two officers then present, Rawstron and Pappas, to rush down the hallway without ascertaining whether the defendant was there or whether Coleman herself might prove a threat.  Both Rawstron and Pappas testified unequivocally that they waited at the door for Coleman to reach them.  Rawstron denied on cross-examination that the reason he could see Coleman coming down the hall was because he "blew past" Saydi.  Finally, Pappas testified that, as of the time Coleman reached the front door, he was standing on the threshold, where he could begin to see down the hallway, and Rawstron was standing just beyond the threshold.  The photographs placed in evidence by the defendant, particularly Defendant's Exhibit 5, suggest that a person standing just beyond the entry threshold would be in a position to have a clear view of the length of the hallway.  *See* Dft's Exhs. 5-6.

Pappas then holstered his weapon. The holstered weapons would have remained visible to the defendant.

The bedroom was approximately 12 feet by 12 feet and furnished with a bed, a chair near the head of the bed, and two dressers, one at the foot of the bed, serving as a stand for a large television, and a longer one against the wall opposite the foot of the bed, further from the bed and closer to the bedroom door. There were piles of clothing and blankets on the floor.

The defendant, who was wearing only a thin pair of pajama pants, asked for clothing, and Rawstron directed him to step out into the hallway. Given the defendant's state of attire, Rawstron perceived no need to pat him down and did not do so. The defendant called out to Coleman to get his bail, and Rawstron explained that there would be no bail because he had a federal warrant for the defendant's arrest. The defendant asked Rawstron what the warrant was for, and Rawstron explained that it was for a drug conspiracy. The defendant said, "Fuck, that means somebody's talking about me."

At about that time, Michaud, who had been notified that Rawstron and Pappas had located the defendant, entered the apartment. Brown and Madore had been called away, while Rooney remained on guard outside. Michaud observed Rawstron, Pappas, and the defendant standing in the hallway and the Coleman family gathered in the kitchen, which was off of the first door on the right side of the hallway. He positioned himself in the doorway between the hallway and the kitchen, enabling him to keep tabs on both the Coleman family and Rawstron, Pappas, and the defendant.

One of Rawstron's aims in effectuating the defendant's arrest was to elicit information about guns and drugs that he suspected might be present in the apartment. He told the defendant that agents were already speaking with Coleman and would be asking her to consent to a search.

He asked if officers would find anything illegal. The defendant stared at Rawstron and appeared very nervous, then asked to go back into the bedroom to speak with him. Pappas cleared off a chair in the bedroom near the head of the bed, and Rawstron brought the defendant back in to the bedroom and directed him to sit there. Rawstron stood near the defendant, and Pappas stood across from them, near the longer dresser and the door.

The defendant asked Rawstron how much time he was looking at. Rawstron responded that it was between the judge and prosecutors, could be between five and 10 years, and would depend on cooperation, among other things. Rawstron asked the defendant about family dynamics, learning that the defendant considered Coleman's youngest child his son, although he was not the child's biological father. Rawstron remarked that he knew the defendant did not want to get Coleman in trouble for items in the apartment that might belong to him, noting that Coleman had several children and that the defendant helped take care of them.

The defendant looked at the edge of the longer dresser and said, "You're going to want to open that drawer." Either Rawstron or Pappas gestured to the left upper drawer, and the defendant nodded yes. Pappas opened the drawer and saw two large bundles of what appeared to be crack cocaine. Rawstron asked the defendant if it was real, and he nodded and said yes. Pappas asked if it was more than three ounces, and the defendant said, "No, not that much."

Rawstron then reminded the defendant that he was with the ATF and asked if he was going to find a firearm in the bedroom. The defendant directed him to look underneath the bed. Pappas did so and saw what appeared to be a black holster. Rawstron asked if that was what the defendant was talking about. Receiving no response, he lifted up the mattress and discovered a firearm. Pappas gestured to Michaud, who by then was standing in the door from the hallway

into the living room, where he had moved with the Coleman family, that a firearm had been found.  Coleman did not witness this gesture.

Throughout their conversation with the defendant, neither Rawstron nor Pappas raised his voice, touched the defendant, or handcuffed him.  The defendant continued to appear nervous and spoke in a very low voice, virtually a whisper, but was calm and polite and appeared to understand everything being said to him.

Rawstron asked the defendant several other questions to which he knew the answers, with respect to which the defendant was not forthcoming.  Rawstron then told him that officers probably would have the chance to talk with him again in the future, informed him that he was under arrest pursuant to the warrant, handcuffed him for the first time that evening, and brought him to the living room, where he was allowed to say goodbye to Coleman and her children.  Rawstron and Rooney then escorted the defendant to Rooney's car, and Rooney eventually drove the defendant to the Cumberland County Jail.

During the period that Rawstron and Pappas were focused on the defendant, Michaud kept watch over the Coleman family.  The kitchen had no table or other furniture, so the family was standing.  Michaud engaged in casual conversation with Coleman.  Shortly after he arrived, he offered, or one of the family asked, to move into the adjacent living room/dining room to watch a movie that was still playing on a computer screen there.  After checking with Rawstron and Pappas, Michaud permitted the family to move.  He continued to engage in casual, light conversation with Coleman as well as Saydi and Ravon.  Coleman, who sat with Keen in her lap, was quiet but cordial.  She did not object to Michaud's presence or ask him to leave.

Before the defendant was escorted outside, one of the officers, presumably Rooney, asked Coleman for consent to bring in a dog and asked if anyone was afraid of dogs. Ravon said that she was. Coleman testified that she consented to the dog search.

After escorting the defendant outside, Rawstron returned to the apartment, spoke briefly with Michaud, then asked Coleman if he could speak with her alone in the kitchen. Once there, he asked whether, if he searched her bedroom, he would find anything illegal. She gave him a blank look. He asked if he could search the whole apartment, and she said yes. He asked if there was anything illegal in the bedroom, and she said nothing of which she was aware. He inquired, "What about the crack cocaine that I found in what appears to be your drawer?" She said, "He hides it wherever he wants to, and it's not mine." Rawstron asked her if she had ever owned or purchased a firearm, and she said no. He then informed her that the officers had found a firearm and asked if she had ever seen the defendant with it, and she responded that she had.[5] Prior to the conversation with Rawstron, Coleman was unaware that officers had found or seized anything from her bedroom.

The tone of Rawstron's conversation with Coleman was pleasant and polite. Neither Coleman nor her children objected to his presence, asked him to leave, or stated that he could not be there without a search warrant.

---

[5] Coleman testified that Rawstron made a remark to the effect that officers had found something in her panty drawer and was sure the defendant was not wearing lace panties. However, she denied that she made any statements about where the defendant put things, told officers that she had seen the defendant with a firearm, or was asked for or gave permission to search the apartment. She testified that the subject of consent to search came up only when she was asked if officers could bring a dog into the apartment. I do not credit this testimony. Rawstron told the defendant that officers were going to seek Coleman's consent to a search, and no reason appears why they would not have. If Coleman consented to the intrusion of a police dog search, it is difficult to believe that she would not have consented to a search by officers.

While Rawstron was speaking with Coleman, Rooney brought his dog into her bedroom. The dog alerted only to the cocaine that had already been discovered.[6] After Rawstron finished conversing with Coleman, he and Michaud went to her bedroom. They discussed the possibility of conducting a further search, but decided against it in view of the fact that the dog had found nothing else in the bedroom and to avoid further disruption to the Coleman family.

Officers were in the Coleman apartment for a total of approximately an hour. They did not have a warrant to search the Coleman residence. At no point during their interaction with the defendant in the Coleman apartment on the evening of March 11 did any of the officers advise him of his *Miranda* rights.[7] From the time police entered the Coleman apartment, they were in control of it. The occupants were under constant surveillance. If any of them, including Keen, had wished to use their own bathroom, he or she would have had to ask permission. Coleman felt that she had no control over the situation.

## B. Discussion

The defendant seeks to suppress all statements made, and all evidence gathered, on March 11, 2014, and all fruits of either on the basis that officers illegally entered the Coleman apartment that evening. *See* Defendant Young's Reply Memorandum in Support of His Motion To Suppress Fruits of Search or Interrogation and All Post Arrest [sic] ("Suppress/Reply") (ECF No. 153) at 1-4. Alternatively, he seeks to suppress all statements made on March 11, 2014, and all fruits thereof on the grounds that those statements were involuntary and/or were elicited while

---

[6] It was not clear who, if anyone, stayed with the defendant after Rawstron and Rooney returned to the apartment. Rawstron testified that he believed Pappas did.

[7] Pursuant to *Miranda v. Arizona,* 384 U.S. 436 (1966), an accused must be advised prior to custodial interrogation "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda,* 384 U.S. at 478-79.

he was in custody without benefit of *Miranda* warnings, and all evidence seized that evening and all fruits thereof on the basis that officers' search of the bedroom from which he was arrested violated his Fourth Amendment rights. *See* Motion To Suppress at 3-7.

The government bears the burden of proving (i) the lawfulness of warrantless entry into a residence, *see, e.g., United States v. Romain,* 393 F.3d 63, 68–69 (1st Cir. 2004), (ii) *Miranda* compliance, *see, e.g., United States v. Barone,* 968 F.2d 1378, 1384 (1st Cir. 1992), (iii) the voluntariness of a confession, *see, e.g., United States v. Jackson,* 918 F.2d 236, 241 (1st Cir. 1990), and (iv) the lawfulness of warrantless searches and seizures, *see, e.g., United States v. Ramos-Morales,* 981 F.2d 625, 628 (1st Cir. 1992).

The government concedes that all statements made by the defendant on March 11, 2014, apart from his initial exclamation, "Fuck, [conspiracy,] that means people must be talking about me[,]" were made in response to questioning or its functional equivalent, without the benefit of the administration of *Miranda* warnings. *See* Government's Opposition to Defendant's Motion To Suppress ("Suppress/Opposition") (ECF No. 134) at 6. It represents that it does not intend to use those statements in its case-in-chief, although it reserves the right to use them on cross-examination to impeach the defendant or in rebuttal. *See id.* Accordingly, as to those statements, the court should grant the Motion To Suppress.

With respect to the defendant's initial statement, and the evidence seized from the Coleman bedroom, I recommend for the reasons that follow that the Motion To Suppress be denied.

### 1. Officers' Initial Entry Into Apartment

As a threshold matter, the defendant contends that the government waived any opposition to his argument that officers' entry into the Coleman apartment was illegal by failing to address

the point in its responsive brief. *See* Suppress/Reply at 1-4. At oral argument, counsel for the government disagreed, asserting that the defendant did not raise the issue sufficiently in his motion to require a response.

The government is correct. While the defendant noted in passing, in the context of setting forth factual background and arguing that the search was illegal, that agents entered the Coleman apartment without a search warrant, *see* Motion To Suppress at 1-2, 7, he argued for suppression on only three bases: that his statements were involuntary, that the agents elicited those statements without benefit of *Miranda* warnings, and that the apartment search violated his Fourth Amendment rights, *see id.* at 3-7. He did not make clear his intention to seek suppression on the basis of the asserted illegal entry until he filed his reply brief. *See* Suppress/Reply at 1-4. The government, therefore, cannot fairly be said to have waived any opposition to the point by failing to join issue on it in its opposing brief. I, therefore, turn to the merits.

At oral argument, counsel for the government acknowledged that no one at the Coleman apartment consented to officers' entry on the evening of March 11, 2014. However, he contended that the entry nonetheless was lawful pursuant to *Payton v. New York*, 445 U.S. 573 (1980), and its progeny, including *United States v. Graham*, 553 F.3d 6 (1st Cir. 2009), which recognize that officers may enter a residence for the limited purpose of arresting the subject of an arrest warrant when they "reasonably believe[] prior to entry that [the subject of the arrest warrant] (1) reside[s] at the apartment and (2) [will] be present." *Graham*, 553 F.3d at 12, 14 (citation and internal punctuation omitted). *See also* Government's Post-Hearing Brief at 3-4.

The defendant's counsel rejoined that the government failed to meet its burden of demonstrating that officers' entry was permissible pursuant to *Payton* and that, instead, their entry was impermissible pursuant to *Steagald v. United States*, 451 U.S. 204 (1981). *See*

*Steagald*, 451 U.S. at 212, 216 (holding that an arrest warrant is inadequate, in the absence of a search warrant, "to protect the Fourth Amendment interests of persons not named in the warrant, when their homes are searched without their consent and in the absence of exigent circumstances").

"It is settled Fourth Amendment law that 'an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.'" *Solis-Alarcón v. United States*, 662 F.3d 577, 580 (1st Cir. 2011) (quoting *Payton*, 445 U.S. at 603). "[W]here police had a reasonable belief that the subject of the arrest warrant resided at the place entered[,] *Payton*, not *Steagald*, applies[.]" *Graham*, 553 F.3d at 14 (citation and internal quotation marks omitted). *See also, e.g., United States v. Thompson*, 402 Fed. Appx. 378, 382 (10th Cir. 2010) ("Whether *Steagald* (third-party's home) or *Payton* (suspect's home) applies is resolved under the first prong of the *Payton* test. If the officers reasonably believe the suspect lives at the residence, then *Payton* applies.") (citation omitted). I conclude that, in this case, officers reasonably believed that the defendant resided at the Coleman apartment. Hence, *Payton,* not *Steagald*, is controlling.

As the government observes, *see* Government's Post-Hearing Brief at 4, "the police need not possess such rock-solid indicators of residence" as mail addressed to a residence "in order to form a 'reasonable belief' that a suspect resides at a given place[,]" *Graham*, 553 F.3d at 13.[8] As

---

[8] The defendant correctly observes that there is a split in the circuit courts of appeals as to whether the government need show that officers had reasonable belief or probable cause to believe that an arrestee resided and was present at an address, and that the First Circuit has left the issue open. *See* Defendant's Post-Hearing Brief at 6-7 & n.1; *see also, e.g., United States v. Hill*, 649 F.3d 258, 262-63 (4th Cir. 2011) ("Some circuits have found that reasonable belief is the same as probable cause. Other circuits have simply found that the distinction between reasonable belief and probable cause is indefinite or negligible. While still other circuits have found that the requirements of reasonable belief are something less than probable cause. A final set of circuits has taken no position as to the relationship between 'reasonable belief' and probable cause.") (citations omitted); *United States v. Weems*, 322 F.3d 18, 22 (1st Cir. 2003). He argues in favor of the adoption of a probable cause standard. *See* Defendant's Post-Hearing Brief at 6. However, as the government notes, *see* Government's Post-Hearing Brief at 3, the First Circuit (*continued on next page*)

the government further notes, *see* Government's Post-Hearing Brief at 4, an individual can have

more than one residence for *Payton* purposes, *see, e.g., Thompson*, 402 Fed. Appx. at 384 ("Can

officers reasonably believe that a suspect lives at two or more places?  The language in *Payton*

suggests the answer is yes.  Justice Stevens, writing on behalf of the Court, stated that, 'an arrest

warrant founded on probable cause carries with it the limited authority to enter *a dwelling* in

which the suspect lives when there is reason to believe the suspect is within.'") (quoting *Payton*,

445 U.S. at 603) (emphasis in original); *United States v. Gay*, 240 F.3d 1222, 1226-27 (10th Cir.

2001) ("[P]eople do not live in individual, separate, hermetically sealed residences[, but] live

with other people[;] they move from one residence to another.") (citation and internal quotation

marks omitted); *United States v. Risse*, 83 F.3d 212, 217 (8th Cir. 1996) ("We have found no

authority to support Risse's implicit assumption that a person can have only one residence for

Fourth Amendment purposes.").

In this case, Webster informed officers that if the defendant was not at the Ash Street,

Howe Street, or Horton Street apartments, he had to be back with his former girlfriend "Jen" on

Walnut Street, where he had been staying a couple of nights here and there when he was not with

Davidson.  Webster was not an anonymous tipster.  Davidson had informed officers that the

defendant had stayed with her and Webster at the Ash Street apartment, and officers had received

information earlier on the night of March 11 that the defendant might be found at Webster's Ash

---

has stated that, while it has not explicitly made a choice, it has implicitly adopted the majority view that the standard
is "reasonable belief," meaning something less stringent than probable cause, *see United States v. Werra*, 638 F.3d
326, 337 (1st Cir. 2011).  I adopt that view, as well.  However, in this case, the government's showing suffices to
meet the more stringent probable cause standard.  *See United States v. Vongkaysone*, 434 F.3d 68, 73-74 (1st Cir.
2006) ("Probable cause exists when police officers, relying on reasonably trustworthy facts and circumstances, have
information upon which a reasonably prudent person would believe the suspect [resided and was present at the place
to be entered].  The inquiry into probable cause focuses on what the officer knew at the time of the [entry], and
should evaluate the totality of the circumstances.  Probable cause is a common sense, nontechnical conception that
deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal
technicians, act.") (citations and internal punctuation omitted).

Street apartment. "[A] face-to-face informant must, as a general matter, be thought more reliable than an anonymous telephone tipster, for the former runs the greater risk that he may be held accountable if his information proves false." *Gay*, 240 F.3d at 1227 (citation and internal quotation marks omitted). Moreover, officers reasonably could have interpreted the phrases "staying with" and "back with" to mean "living with." *See, e.g., Graham*, 553 F.3d at 13 ("police could reasonably interpret [the] colloquial phrase 'staying with' to mean 'living with'") (citation omitted).

Upon arriving at the Walnut Street residence, Rawstron recognized a car parked outside as belonging to Coleman. Both he and Michaud knew that Coleman had a longtime relationship with the defendant and that the two had previously lived together at an apartment on Tampa Street in Lewiston. They had eliminated three other addresses as places where the defendant might be found. To cinch matters, when Coleman came to the door to speak with Rawstron and Pappas, she confirmed that the defendant was present. Therefore, at the time of their entry, the officers harbored a reasonable belief that the defendant resided there. *See, e.g., Werra*, 638 F.3d at 338 (describing cases in which officers were held to possess a reasonable belief that a suspect resided at an address as including those in which a "hotel manager told officers that [a] suspect had rented a particular room for three weeks, and a man detained in the parking lot told officers that [the] suspect was then inside the suite[,]" and "officers who went to [a] defendant's home were told he was not there; [the] defendant's girlfriend's sister said he was at a certain room at a motel; the room was registered in the sister's name; and a motel maintenance worker identified the defendant as the sole occupant of the room").[9]

---

[9] Although not mentioned by the government, Michaud also testified that he saw the defendant open the blinds as he stood guard outside the building while Rawstron and Pappas went inside. This fact, while not necessary to a finding that officers had a reasonable belief that the defendant resided at that address, strengthens the case that they did.

The government's showing also satisfies the second prong of the *Payton* analysis. The time of day that officers knocked on the door of the Coleman apartment – 11:00 p.m., when people typically are at home – coupled with Coleman's confirmation of the defendant's presence, sufficed to confer a reasonable belief that he was there. *See, e.g., id.* at 338-39 (observing that, "[a]lthough actual viewing of the suspect on the premises is not required, the officers must point to at least some evidence suggesting that the individual named in the arrest warrant is present"); *United States v. Veal*, 453 F.3d 164, 168 (3d Cir. 2006) (officer reasonably believed suspect was present when, *inter alia*, they "arrived early in the morning, when it was reasonable to expect that residents or guests would still be present").[10]

Officers' entry into the Coleman apartment, therefore, was lawful.

## 2. Defendant's Statements

As noted above, the government concedes that all but one of the defendant's statements was obtained without the benefit of *Miranda* warnings, as a result of which I have recommended that the court grant the motion as to them. The government contests the motion, however, insofar as the defendant seeks to suppress his initial statement, which the government asserts was not the result of direct questioning or its functional equivalent and was made voluntarily. *See* Suppress/Opposition at 6. I agree.

---

[10] At oral argument and in his post-hearing brief, the defendant emphasized that the government had taken the position at his detention hearing that he had no stable residence and merely bounced from house to house, a view that the court accepted, finding the "transitory nature" of the defendant's residence a factor weighing in favor of his detention. *See* Defendant's Post-Hearing Brief at 3-4; Transcript of Proceedings (ECF No. 107) at 18-19, 44. The defendant does not explain why the government's position at his detention hearing has any bearing on the instant analysis, and I perceive none. The question presented is whether *the officers* who went in search of the defendant on the night of March 11 reasonably believed that he resided and was present at the Coleman address. None of those officers testified at the detention hearing. Moreover, even if the defendant did not reside at the Coleman residence on the night of March 11, that would not be dispositive. An officer's reasonable belief that the subject of an arrest warrant resides at the place entered "need not ultimately be correct[.]" *Graham*, 553 F.3d at 12.

Involuntary confessions violate the due-process clauses of the Fifth and Fourteenth amendments. *See, e.g., United States v. Genao,* 281 F.3d 305, 310 (1st Cir. 2002). In the face of a defendant's claim that his or her confession was extracted involuntarily, the government bears the burden of showing, based on the totality of the circumstances, that investigating agents neither "broke" nor overbore his or her will. *Chambers v. Florida,* 309 U.S. 227, 239-40 (1940). As this language suggests, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary[.]'" *Colorado v. Connelly,* 479 U.S. 157, 167 (1986). *See also, e.g., Rice v. Cooper,* 148 F.3d 747, 750 (7th Cir. 1998) ("A confession or other admission is not deemed coerced or involuntary merely because it would not have been made had the defendant not been mentally defective or deranged. The relevant constitutional principles are aimed not at protecting people from themselves but at curbing abusive practices by public officers.") (citation omitted).

The First Circuit has noted:

> Relevant considerations include the length and nature of the questioning, promises or threats made by investigators, and any deprivation of the suspect's essential needs. They also include the defendant's personal circumstances, including his age, education, intelligence, and mental condition, as well as his prior experience with the criminal justice system. A defendant's calm demeanor and the lucidity of his statements weigh in favor of finding his confession voluntary.

*United States v. Jacques*, 744 F.3d 804, 809 (1st Cir. 2014), *petition for cert. filed*, June 9, 2014 (citations omitted).

Although Rawstron and Pappas approached the defendant with a flashlight and guns drawn, they holstered their firearms within a matter of seconds after he complied with their commands. The defendant had asked for clothing, and the officers were in the process of accommodating that request. After being informed that officers had a warrant for his arrest, the

defendant questioned what it was for, and Rawstron explained that it was for a drug conspiracy. The defendant then uttered the statement at issue. In the circumstances, the statement was not the product of coercive police activity but, rather, a spontaneous, voluntary utterance. The motion, accordingly, should be denied as to that statement.

### 3. Search of Bedroom and Seizure of Drugs and Gun

The defendant finally seeks suppression of the drugs and firearm seized from the bedroom where he was found, contending that officers lacked a valid consent or other basis on which to search for and seize those items. *See* Motion To Suppress at 6-7. The government argues that the evidence is admissible on any of several bases, having been discovered and seized as a result of (i) the defendant's voluntary statements, (ii) the defendant's implied consent, (iii) a valid search incident to the defendant's arrest, and (iv) what would have been the items' inevitable discovery pursuant to Coleman's consent to search the bedroom. *See* Suppress/Opposition at 7-14. I conclude that on either of the first or second bases, the evidence is admissible. I do not consider whether it is admissible on the remaining alternative grounds.

As the government notes, *see id.* at 7, "[t]he Supreme Court has held that physical evidence need not be excluded simply because it is discovered as a result of unwarned questioning in violation of *Miranda*[,]" *United States v. Jackson*, 544 F.3d 351, 361 (1st Cir. 2008). The government meets its burden of demonstrating that the defendant voluntarily made statements leading to the discovery of the evidence at issue, and impliedly consented to its seizure.

The defendant was questioned for less than an hour by one officer, Rawstron, in the presence of a second officer, Pappas. Rawstron and Pappas quickly holstered their firearms after ordering the defendant off of the bed and did not brandish them again. The defendant was not

handcuffed until he was taken from the Coleman apartment. After Rawstron took the defendant's right arm to lead him away from the bed, neither officer touched the defendant. The defendant appeared nervous and spoke in a very low voice, virtually a whisper, but was calm and polite and appeared to understand everything being said to him.

The defendant was not new to the criminal justice system; he had a prior criminal record. In addition to being questioned by officers, he asked them some questions, including the possible length of any sentence. Toward the end of the questioning, he provided answers that Rawstron knew were not forthcoming, suggesting that he was exercising discretion in choosing what to reveal.

While Rawstron told the defendant that the amount of time that he would serve depended in part on whether he cooperated, and appealed to his feelings for Coleman and her children, suggesting that the defendant would not want to get Coleman in trouble for something in the apartment that did not belong to her, these tactics were not sufficiently coercive to render the defendant's statements regarding the whereabouts of the drugs and the gun involuntary. *See, e.g.*, *Jacques*, 744 F.3d at 809-11 ("It is well settled in the First Circuit that an officer does not impermissibly overbear a defendant's will by promising to bring the defendant's cooperation to the prosecutor's attention or by suggesting that cooperation may lead to more favorable treatment. . . . [T]he mere fact that a defendant is placed under some psychological pressure by agents does not necessarily render a confession involuntary. . . . [T]his circuit refused to find that a defendant's confession was involuntary on the basis of police officers' threats to charge his sister with a crime if he did not cooperate.").

The defendant, moreover, impliedly consented to the seizure of the items he seeks to suppress. The First Circuit has ruled that "consent may be express or inferred from conduct,"

also called "implied-in-fact consent[.]"  *United States v. Winston,* 444 F.3d 115, 121 (1st Cir. 2006). Nonverbal communications can form the basis for implied-in-fact consent.  *See id.* at 122 (finding implied-in-fact consent to search when a defendant motioned to a nightstand with his shoulder); *United States v. Miller,* 589 F.2d 1117, 1131 (1st Cir. 1978) (finding implied-in-fact consent to search when the defendant unlocked his suitcase).

The defendant impliedly consented to the seizure of the drugs when he looked at the edge of the dresser and stated, "You're going to want to open that drawer," and then nodded yes when either Rawstron or Pappas gestured to the upper left hand drawer.  He impliedly consented to the seizure of the firearm when he directed officers to look under his bed in response to a question as to whether they would find a firearm in the bedroom.  While officers initially found only a holster, that quickly led to the discovery of the firearm under the mattress.  For the same reasons that his statements were voluntary, his implied consent was uncoerced, as well.

For all of these reasons, the court should grant the Motion To Suppress with respect to the defendant's statements made to officers on March 11, 2014, other than the defendant's initial voluntary statement, and otherwise deny it.

## II.  Motions To Dismiss

## A.  Applicable Legal Standards

This court has noted:

> By returning an indictment, a grand jury is carrying out a constitutional function set forth in the Bill of Rights.  Unlike civil actions, an indictment is not generally subject to dispositive motion practice.  Dismissing an indictment is an extraordinary step.  In *Whitehouse v. United States District Court,* [53 F.3d 1349 (1st Cir. 1995),] the First Circuit observed that when a federal court uses its supervisory power to dismiss an indictment it directly encroaches upon the fundamental role of the grand jury.  That power is appropriately reserved, therefore, for extremely limited circumstances.

*United States v. Mbugua*, No. CR-10-116-B-W, 2010 WL 4024801, at *3 (D. Me. Oct. 13, 2010) (citations and internal punctuation omitted).

### B. Motion/Insufficiency

The defendant moves to dismiss Counts One and Six of the Superseding Indictment on the basis that they are too vaguely worded and lack sufficient factual detail to provide adequate notice of the crimes with which he is charged. *See generally* Motion/Insufficiency. Federal Rule of Criminal Procedure 7 provides, in relevant part, "The indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged and must be signed by an attorney for the government." Fed. R. Crim. P. 7(c)(1). "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974). "It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." *Id.* (citation and internal quotation marks omitted). "Undoubtedly the language of the statute may be used in the general description of an offence, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged." *Id.* at 117-18 (citation and internal quotation marks omitted).

### 1. Count One

Count One of the Superseding Indictment charges that "[f]rom at least November 2012, the exact date being unknown to the Grand Jury, and continuing to about March 2013, in the

District of Maine," the defendant and his co-defendants, Glenn Murchison and Rebekah Zapatier, "conspired with one another and other persons known and unknown to the Grand Jury[] to distribute and possess with intent to distribute 28 grams or more of a mixture or substance containing a detectable amount of cocaine base, in violation of Title 21, United States Code, Section 841(a)(1)." Superseding Indictment at 1. The Superseding Indictment alleges that the penalty provisions of 21 U.S.C. § 841(b)(1)(B) apply to the conspiracy and that the defendant's conduct as a member of the conspiracy involved 28 grams or more of a mixture or substance containing a detectable amount of cocaine base. *See id*. at 1-2.

The defendant initially contended that Count One was deficient in that it failed to name other asserted co-conspirators, pinpoint a more exact location than the District of Maine, or set forth definite times within which the conspiracy was alleged to occur. *See* Motion/Insufficiency at 6-7. However, in response to the government's opposition citing decisions of this court and the First Circuit holding that conspiracy charges nearly identical to those set forth in Count One are sufficient, he recognized that the court was not likely to dismiss Count One. *See* Defendant Young's Reply Memorandum in Support of His Motion To Dismiss for Insufficiency of the Superseding Indictment ("Insufficiency/Reply") (ECF No. 151) at 2. He, nonetheless, "preserve[d] his motion to dismiss Count One . . . both to preserve the argument that those decisions are incorrectly decided and because the government has mistakenly come to contend that there is an automatic rule that minimally sufficient in some circumstances is necessarily sufficient in all circumstances." *Id*.[11]

---

[11] The government cited, *inter alia*, *United States v. Worthy*, 842 F. Supp.2d 396 (D. Me. 2012). *See* Government's Opposition to Defendant's Motion To Dismiss for Insufficiency of the Superseding Indictment ("Insufficiency/Opposition") (ECF No. 137) at 4. In *Worthy*, in denying a motion to dismiss a drug conspiracy charge similar to that at issue here, Judge Hornby noted, "The defendant is hardly the first to criticize the way conspiracy law favors the government in pursuing criminal charges. But the law is clear that it is sufficient for the (*continued on next page*)

At oral argument, the defendant's counsel raised a new argument, seeking to distinguish the line of cases on which the government relied, on the basis that, in those cases, including *Worthy*, the government had not charged "conduct" as part of the conspiracy, whereas here the government expressly charged that the defendant's "conduct as a member of the conspiracy charged in Count One involved 28 grams or more of a mixture or substance containing a detectable amount of cocaine base, and, therefore, the penalty provisions of Title 21, United States Code, Section 841(b)(1)(B) apply as to him." Superseding Indictment at 2. He contended that the requirements for alleging conduct, accordingly, apply to Count One.

The government presumably added this allegation to comply with *Alleyne v. United States*, 133 S. Ct. 2151 (2013), in which the Supreme Court held that "[f]acts that increase the mandatory minimum sentence are . . . elements and must be submitted to the jury and found beyond a reasonable doubt." *Alleyne*, 133 S. Ct. at 2158. The Court noted that this was consistent with its decision in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), in which it had reached the same conclusion with respect to facts that increase the statutory maximum sentence. *See id*.

Nonetheless, "under *Apprendi* and *Alleyne*, drug quantity is an element for purposes of the aggravated penalties under §§ 841(b)(1)(A) and 841(b)(1)(B), but it is not an element necessary for conviction of the core offenses under §§ 841(a) and 846." *United States v. Delgado-Marrero*, 744 F.3d 167, 191 (1st Cir. 2014). "Where a defendant may be subject to enhanced statutory penalties because of drug quantity or type, the requisite fourth 'element' under *Apprendi* is not a formal element of the conspiracy offense." *Id*. (citation and internal punctuation omitted).

---

indictment to allege approximate time parameters and that the indictment need not identify all members of the conspiracy but can refer to others known and unknown to the grand jury." *Worthy*, 842 F. Supp.2d at 398.

For purposes of the core offense under sections 841(a) and 846, the language at issue here is virtually identical to that in *Worthy*, *compare* Superseding Indictment at 1 *with* Fourth Superseding Indictment (ECF No. 507), *United States v. Miller, et al*., No. 2:10-cr-136-DBH (D. Me.), at 1, and it passes muster for the same reasons as in *Worthy*.  For purposes of the applicable penalty provision, the Superseding Indictment adequately apprises the defendant of the drug quantity with which he is charged.

The defendant offers no persuasive reason why, in view of this court's own precedents and those of the First Circuit, it should exercise its discretion to take the "extraordinary step" of dismissing Count One of the indictment.  *Mbugua*, 2010 WL 4024801, at *3 (citation and internal quotation marks omitted).  The motion, accordingly, should be denied with respect to that count.

## 2.  Count Six

The defendant also seeks dismissal of Count Six, arguing that it is "even more troublingly ambiguous" than Count One, omitting crucial details without which he cannot reasonably prepare to defend himself, to wit, the name of the person(s) he allegedly aided, the place of the possession other than somewhere in Maine, the quantity of cocaine base involved, and the name of the intended or actual transferee.  *See* Motion/Insufficiency at 8.  He reasons that Count Six, as worded, is akin to charging a defendant with aiding and abetting the robbery of some unspecified federally insured bank in some unspecified location.  *See id.*

The government rejoins that the defendant's challenge to Count Six fails for essentially the same reasons as his challenge to Count One: that Count Six informs him of the date on which he is alleged to have aided and abetted the distribution of crack cocaine, alleges all of the essential elements of the crime, and adequately apprises him of the offense with which he is

charged.  *See* Insufficiency/Opposition at 5.  The government adds that it has already provided the defendant with discovery that supplies the details that he complains are missing, such as the location of the purchase and the amount of crack cocaine distributed.  *See id.*

The defendant maintains that (i) caselaw pertaining to conspiracy charges is distinguishable, in that Count Six charges not a conspiracy but a discrete substantive offense, (ii) Count Six lacks even the detail that the First Circuit explained, in *United States v. Tomasetta*, 429 F.2d 978 (1st Cir. 1970), would suffice to charge a defendant with direct participation in a drug deal – the municipality in which the deal allegedly occurred and the quantity of drugs allegedly sold, and (iii) here, the government clarifies that it charges the defendant with aiding and abetting a drug deal, yet Count Six offers no detail whatsoever as to how he allegedly did so. *See* Insufficiency/Reply at 5.  He adds that the conspiracy charge in Count One provides no helpful context because the conduct at issue in Count Six is alleged to have occurred nearly a year after the conspiracy ended.  *See id.*  Finally, he argues that the provision of discovery or even of a bill of particulars cannot cure a deficient indictment.  *See id.* at 5-6.

In *Tomasetta*, the First Circuit held that an indictment charging a violation of the loan sharking provisions of the Consumer Credit Protection Act of 1968 – specifically, participation in the collection of extensions of credit by extortionate means – was deficient when it failed to name the victim of the alleged extortionate collection.  *See Tomasetta*, 429 F.2d at 979.  The First Circuit explained:

> In reaching this conclusion we stress that no one factor is determinative.  The failure to specify the means by which the alleged threats were communicated need not, of itself, be fatal.  The failure to specify with greater precision the location of the alleged offense would surely not have given rise to this result were sufficient additional facts averred.  And even the failure to name the victim, as serious a handicap to the defense as that on occasion may be, might not alone have led to this result. These factors, however, when taken together, made it unfair to require the defendant to answer this charge.

*Id*. at 980-81 (citations omitted).  The First Circuit cautioned:

> In applying these criteria [concerning the sufficiency of an indictment] to the case at bar we think it essential to bear two things in mind.  First, what is a fair description of a crime for purposes of permitting an adequate defense necessarily varies with the nature of the offense and the peculiarities of defending against the kind of charge involved.  Second, arbitrary rules as to the necessity, in the abstract, of a given averment have no place in the analysis, as the question is whether the indictment as a whole conveys sufficient information to properly identify the conduct relied upon by the grand jury in preferring the charge.

*Id*. at 979 (citations omitted).

The First Circuit distinguished *Tomasetta* from *Dario Sanchez v. United States*, 341 F.2d 379 (1st Cir. 1965), which held that an indictment charging unlawful transfer of a narcotic or drug without a written order was not fatally defective when it did not provide the name of the transferee, in circumstances in which it stated all of the elements of the offense and gave the date, city where the transaction occurred, and drug quantity.  *See id*. at 981; *see also Dario Sanchez*, 341 F.2d at 380-81 (observing, in declining to follow *Lauer v. United States*, 320 F.2d 187 (7th Cir. 1963), "We gather from the [*Lauer*] opinion that the court had two considerations in mind: that the name of the transferee was needed in order to prepare a defense, and to show, in case of a subsequent prosecution, the identity of the offense.  Except for *Lauer* we know of no case which requires an indictment to supply with full particularity all that might be needed with respect to either of these matters.  The test of an indictment is whether it sufficiently identifies the offense, not whether it might have been more complete.").

In this case, as in *Dario Sanchez*, the omission of the name of the transferee(s), which is not an element of the crime charged, is not fatally defective.  *See* 21 U.S.C. §§ 841(a)(1) & (b)(1)(C); 18 U.S.C. § 2.  Nor is the omission of the name of the principal(s) whom the defendant allegedly aided.  *See, e.g, United States v. Somers*, 950 F.2d 1279, 1283 (7th Cir.

1991) (rejecting challenge to sufficiency of indictments on basis that they failed to identify the principal whom the defendant allegedly aided and abetted in distributing cocaine in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1); observing, "In order to convict a defendant as an aider or abettor under § 2, it has never been necessary to convict or even identify the principal, provided there is sufficient evidence to establish the commission of the substantive offense.").

Unlike in *Dario Sanchez*, the indictment in this case does not specify drug quantity or pinpoint the municipality within which the conduct is alleged to have occurred. However, these omissions do not render it insufficient. Drug quantity is not, even under *Alleyne*, an element of the crime charged in Count Six. *See* 21 U.S.C. §§ 841(a)(1) & (b)(1)(C); 18 U.S.C. § 2; *Delgado-Marrero*, 744 F.3d at 186 (noting, with respect to 21 U.S.C. § 841(b)(1)(C), that "[f]or an indeterminate quantity of cocaine, there is no mandatory minimum term of imprisonment"). The factual details provided, including the precise date of the alleged conduct, the precise drug allegedly involved, and the fact that the conduct allegedly occurred in Maine, sufficiently identify the alleged offense.

For these reasons, the motion to dismiss on the ground of the facial insufficiency of the indictment with respect to Counts One and Six should be denied.

### C. Motion/Unconstitutionality

The defendant next seeks dismissal of Count One of the Superseding Indictment on the basis that 21 U.S.C. § 841(b)(1)(B) is unconstitutional on its face and as applied. *See* Motion/Unconstitutionality at 1. He argues that:

1. The language of section 841(b), as well as First Circuit precedent interpreting it, establish that it was intended to treat as mere "sentencing factors," to be determined by the court, facts that substantially increase the lawful range of sentences in a particular case. *See id*. at 2.

*Alleyne* makes clear that this is facially unconstitutional. *See id*. at 7-8; *see also Alleyne*, 133 S. Ct. at 2158 (holding that "[f]acts that increase the mandatory minimum sentence are . . . elements and must be submitted to the jury and found beyond a reasonable doubt").

2.      Section 841(b), as it interrelates with sections 21 U.S.C. §§ 841(a) and 846, is impermissibly vague in that it leaves great doubt as to the "quantity" of drugs "involved" in an offense for purposes of determining a particular defendant's sentence. *See* Motion/Unconstitutionality at 2. Particularly in a conspiracy case, it is unclear "whether the relevant quantity is the quantity involved in a particular transaction, the quantity actually involved in an alleged organization's actual activities, the quantity the organization agreed would be involved, the quantity actually involved in a particular defendant's conduct or the quantity a particular defendant intended or agreed would be involved in his conduct." *Id*. The inherent ambiguity is illustrated by this court's grammatically implausible interpretation of section 841(b) as referring to two different quantities, the quantity involved in the overall conspiracy (for purposes of the maximum penalty) and the quantity involved in a particular conspirator's conduct (for purposes of the mandatory minimum penalty). *See id*. at 2-3.

## 1.  Facial Challenge

As the government points out, *see* Government's Opposition to Defendant's Motion To Dismiss Count One of the Superseding Indictment ("Unconstitutionality/Opposition") (ECF No. 138) at 2-3, in *United States v. Collazo-Aponte*, 281 F.3d 320 (1st Cir. 2002), the First Circuit rejected a virtually identical challenge to the facial validity of section 841(b) in the wake of the Supreme Court's issuance of *Apprendi*. Collazo-Aponte argued that *Apprendi* rendered the penalty provisions of section 841(b) unconstitutional because, pre-*Apprendi*, they had been administered by the sentencing judge under a preponderance of the evidence standard. *See*

*Collazo-Aponte*, 281 F.3d at 324-25.  The First Circuit deemed that argument "unpersuasive because none of the provisions of § 841(b) contradicts *Apprendi*'s mandate."  *Id.* at 325.  It explained:

> Section 841(b) does not require that sentencing judges determine the facts that increase the penalty for the crime beyond the prescribed statutory maximum.  Nor does § 841(b) require that such facts be determined by a preponderance of the evidence.  The statute is silent as to who makes these findings and under what burden of persuasion.  Hence, there is nothing in the statutory language that explicitly defies *Apprendi*.

> Moreover, the Constitution, as interpreted by *Apprendi*, simply makes the jury the decisionmaker and the reasonable-doubt standard the proper burden for facts that increase the penalty beyond the applicable statutory maximum.  How statutes are implemented to fulfil[l] that requirement is a subject to which the Constitution does not speak.

*Id.* (citation and internal punctuation omitted).  The same is true here.  None of the provisions of section 841(b) contradicts *Alleyne*'s mandate.[12]

## 2.  As-Applied Challenge (Vagueness)

The government correctly notes that vagueness challenges to statutes that do not involve First Amendment freedoms "may not rest on arguments that the law is vague in its hypothetical applications, but must show that the law is vague as applied to the facts of the case at hand."  Unconstitutionality/Opposition at 4 (quoting *United States v. Johnson*, 130 F.3d 1352, 1354 (9th Cir. 1997)); *see also Chapman v. United States*, 500 U.S. 453, 467 (1991) (rejecting vagueness

---

[12] The defendant contends that *Collazo-Aponte* relied heavily on the First Circuit's assertion that section 841(b) does not set forth elements and, with this crucial premise undermined by *Alleyne*, *Collazo-Aponte* now supports his motion to dismiss.  *See* Defendant Young's Reply Memorandum in Support of Defendant's Motion To Dismiss Based on Unconstitutionality of Statute (ECF No. 154) at 1.  The observation on which the defendant relies was not crucial to the First Circuit's holding but, rather, was made in passing in the context of rejecting Collazo-Aponte's alternative argument that section 841(b) was unconstitutional post-*Apprendi* because it failed to apply a *mens rea* requirement to drug quantity.  *See Collazo-Aponte*, 281 F.3d at 325-26 & n.3.  The First Circuit agreed that nothing in section 841(b) sets forth a *mens rea* requirement but held that it need not because "the presumption in favor of a scienter requirement should only apply to each of the statutory elements that criminalize otherwise innocent conduct."  *Id.* at 326 (citation and internal quotation marks omitted).  It pointed out that because Collazo-Aponte was "guilty whether he conspired to sell 30 kilos of heroin or 30,00[,]" and "the amount of drugs at issue would not make appellant's behavior unpunishable, his argument necessarily fails."  *Id.*  The same is true post-*Alleyne*.

challenge to 21 U.S.C. § 841 insofar as it pertained to a "mixture or substance" containing LSD; noting, "First Amendment freedoms are not infringed by § 841, so the vagueness claim must be evaluated as the statute is applied to the facts of this case. The fact that there may be plausible arguments against describing blotter paper impregnated with LSD as a 'mixture or substance' containing LSD does not mean that the statute is vague.").

The defendant fails to make this showing, relying on the ways in which section 841(b) plausibly could be interpreted rather than demonstrating its vagueness as applied to him. *See* Motion/Unconstitutionality at 8-9. His motion to dismiss Count One on the basis that it is unconstitutionally vague, accordingly, should be denied.

### III. Motions To Sever

The defendant next contends that (i) his case is misjoined with those of his co-defendants, Glenn Murchison and Rebecca Zapatier, in violation of Federal Rule of Criminal Procedure 8(b), (ii) even if he were the sole defendant, the counts against him are misjoined, in violation of Federal Rule of Criminal Procedure 8(a), and (iii) even if the joinder of co-defendants and/or counts against him is proper, it is prejudicial, warranting severance pursuant to Federal Rule of Criminal Procedure 14(a). *See* First Motion To Sever at 3-6; Second Motion To Sever at 4-10.

### A. Bid for Severance of Co-Defendants

The government concedes the merit of the defendant's bid for severance of his case from those of Murchison and Zapatier pursuant to Rule 8(b) but contends that the request was mooted when Murchison and Zapatier pleaded guilty, effectively rendering this a one-defendant case. *See* Government's Opposition to Defendant's Motion To Sever with Respect to Second Superseding Indictment (ECF No. 186) ("Second Motion To Sever/Opposition") at 4-5. Murchison and Zapatier pleaded guilty to Count One of the Second Superseding Indictment, one

of the four counts pending against Murchison and the three counts pending against Zapatier, and Judge Singal accepted those pleas. *See* ECF Nos. 167, 188, 200, 201; Second Superseding Indictment. Murchison is due to be sentenced on September 29, 2014, *see* ECF No. 188, and Zapatier on October 29, 2014, *see* ECF No. 201.

Pointing out that guilty pleas sometimes unravel, the defendant argues that the court should grant his motion for severance from his co-defendants rather than deeming it moot. *See* Defendant Young's Reply in Support of Motion To Sever with Respect to Second Superseding Indictment ("Second Motion To Sever/Reply") (ECF No. 190) at 4-5. Yet, in a case cited by the defendant, *United States v. Worthy*, No. 2:10-CR-136-DBH-03, 2012 WL 3137235 (D. Me. Aug. 1, 2012), Judge Hornby recognized that motions to sever, which "are designed to secure a separate trial without the presence of a codefendant at that trial[,]" are "[g]enerally . . . considered moot once that codefendant pleads guilty and no longer expects to be tried." *Worthy*, 2012 WL 3137235, at *7.

The motions, accordingly, are deemed moot insofar as they seek the relief of severance of the defendant's trial from those of his co-defendants, without prejudice to the renewal of that request for relief in the unlikely event that circumstances change and either Murchison or Zapatier is expected to stand trial.

### B. Bid for Severance of Counts

The defendant also contends that the charges against him are not sufficiently similar to be properly joined pursuant to Rule 8(a). *See* First Motion To Sever at 5-6; Second Motion To Sever at 6, 8-9. Rule 8(a) provides, in relevant part, that an indictment "may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . are of the same or similar

character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a).

The First Circuit has noted:

> We have construed this rule generously in favor of joinder. Further, 'similar' does not mean 'identical,' and we assess similarity in terms of how the government saw its case at the time of indictment. In determining whether counts are properly joined for trial, we historically have considered whether the charges are laid under the same statute, whether they involve similar victims, locations, or modes of operation, and the time frame in which the charged conduct occurred.

*United States v. Boulanger*, 444 F.3d 76, 87 (1st Cir. 2006) (citations and internal punctuation omitted).

The defendant faults the joinder of Count One with Counts Six through Nine in that Counts Six through Nine each charge a distinct substantive offense that has no relationship to the conspiracy charged in Count One. *See* First Motion To Sever at 5; Second Motion To Sever at 6. He adds that, even if these counts are properly joined, trial on Count Seven should be severed pursuant to Rule 14(a) on the basis that its joinder is particularly prejudicial. *See* Second Motion To Sever at 8-9; *see also* Fed. R. Crim. P. 14(a) ("If the joinder of offenses . . . in an indictment . . . appears to prejudice a defendant . . ., the court may order separate trials of counts[.]").

As the government argues, *see* Government's Opposition to Defendant's Motion To Sever ("First Motion To Sever/Opposition") (ECF No. 135) at 4-5; Second Motion To Sever/Opposition at 5-6, the joinder of Count One, charging conspiracy to distribute cocaine base, and Counts Six and Eight, charging discrete cocaine base offenses, is proper. Counts One, Six, and Eight all involve cocaine base offenses committed within the District of Maine. *See* Second Superseding Indictment at 1, 4-5. While the conduct at issue in Counts Six and Eight is alleged to have occurred approximately one year after the end of the conspiracy at issue in Count One, the counts are sufficiently similar to be properly joined. *See, e.g., United States v.*

*Melendez*, 301 F.3d 27, 36 (1st Cir. 2002) (for purposes of joinder pursuant to Rule 8(a), "cocaine transactions on two different dates are of the same or similar character") (citation and internal quotation marks omitted). "The differences between conspiracy to possess and actual possession are insufficient to deny joinder." *United States v. Kinsella*, 530 F. Supp.2d 356, 359 (D. Me. 2008)

The three cocaine-base counts also are properly joined with Count Seven, which charges possession of a firearm by a convicted felon on or about March 11, 2014, in the District of Maine, and Count Nine, which charges possession of a firearm in furtherance of a drug trafficking crime on or about March 11, 2014, in the District of Maine. *See* Second Superseding Indictment at 5-6. Count Eight, which charges a cocaine-base offense occurring on March 11, 2014, is directly related to Counts Seven and Nine, all of which stem from the defendant's arrest and the seizure from Coleman's apartment of cocaine base and a firearm. *See United States v. Widi*, No. 09-CR-9-P-S, 2010 WL 580005, at *1 (D. Me. Feb. 12, 2010) (charge of possession of firearm by a convicted felon was properly joined with marijuana distribution charge when "[t]he majority of the relevant evidence was obtained during the same search and [was] pertinent to both charges[,]" and "firearms are commonly 'tools of the trade' for sellers and manufacturers of illegal narcotics") (citation omitted). Counts One and Six are also sufficiently related to Counts Seven and Nine given their relationship to Count Eight and the recognized link between firearms and drug trafficking.

I decline the defendant's request that the court exercise discretion pursuant to Rule 14(a) to sever Count Seven even if it is properly joined. A "defendant carries the burden of demonstrating prejudice resulting from a failure to sever, but such a showing does not result in an automatic grant of the motion." *United States v. Gooch*, 665 F.3d 1318, 1326 (D.C. Cir.

2012) (citations omitted).  "Severance is proper only if there is a serious risk that a joint trial would prevent the jury from making a reliable judgment about guilt or innocence."  *Id.* (citations and internal punctuation omitted).

The defendant argues that the joinder of Count Seven permits the government to create "a conduit through which [it] may introduce otherwise inadmissible evidence of [his] prior convictions, thereby potentially tainting the reliability of the verdict rendered by the jury on the other counts."  Second Motion To Sever at 8 (citation and internal quotation marks omitted).  He reasons that this prejudice cannot easily be mitigated by a limiting instruction, given that "it would be quixotic to expect the jurors to perform [the] mental acrobatics needed to avoid being improperly influenced by evidence of a prior felony."  *Id.* (citation and internal quotation marks omitted).  He contends that cases in which a request to sever a felon-in-possession charge has been denied are distinguishable, in that the charge shared a factual basis with the charges for which severance was sought, for example, was part of the same criminal scheme or plan, or the evidence of the alleged prior felony would be admissible in any event pursuant to Federal Rule of Evidence 404(b)(2) to establish motive, opportunity, or intent.  *See id*. at 9.

Nonetheless, this court has rejected similar arguments, reasoning that a limiting instruction, together with a stipulation to the fact of a prior felony conviction, adequately address the concern that otherwise inadmissible evidence of the prior conviction will taint a jury's verdict on other counts.  *See, e.g., Widi*, 2010 WL 580005, at *2.  *See also, e.g., United States v. Turner*, 501 F.3d 59, 72 (1st Cir. 2007) (rejecting argument that district court's refusal to sever felon-in-possession charge prejudiced defendant's entrapment defense; noting, "any possible prejudice was limited by [defendant's] stipulation to his status as a convicted felon").  The defendant, who

bears the burden of persuading the court of the need for severance, has articulated no reason why these tools cannot be employed in this case.[13]

## IV. Motion for Bill of Particulars

The defendant finally moves pursuant to Federal Rule of Criminal Procedure 7(f) for an order directing the government to file a bill of particulars as to Counts One and Six of the Superseding Indictment. *See* Particulars Motion at 1. With respect to Count One, he seeks the names of alleged co-conspirators, their alleged roles in the offense and last known addresses, the date or approximate dates on which he and known co-defendants allegedly joined the alleged conspiracy, and the dates, types of narcotics, and locations of each alleged drug distribution that the government contends were part of the conspiracy. *See id*. With respect to Count Six, he seeks the location in which the substance containing crack cocaine was allegedly possessed and the names of any known person whom he allegedly aided or abetted. *See id*. at 2.

He notes that he has been unable to find any order of this court granting a bill of particulars in more than a decade but requests that the court revisit its view of such bills, particularly to the extent based on acceptance of the government's assertion that it provides "open file" discovery, which he contends is misleading. *See id*. at 4.

The government rejoins that the Superseding Indictment, together with discovery thus far, adequately identify the allegedly unlawful conduct with which the defendant is charged. *See* Government's Opposition to Defendant's Motion for Bill of Particulars (ECF No. 136) at 2. It represents that the defendant has been provided with investigatory reports of controlled

---

[13] To the extent that the defendant seeks severance pursuant to Rule 14(a) of other counts besides Count Seven, he likewise offers no reason why the court could not employ appropriate instructions to mitigate any prejudice flowing from a unified trial on those counts. *See, e.g.,* Second Motion To Sever/Reply at 6; *United States v. Richardson*, 515 F.3d 74, 83 (1st Cir. 2008) (noting that an appropriate limiting instruction provides an adequate safeguard against prejudice from evidentiary spillover).

purchases made from other members of the conspiracy, reports regarding a search warrant executed at an apartment where the defendant was present and where drugs were found, reports of the controlled purchase, arranged between a confidential informant and the defendant, that forms the basis for Count Six, and call records for telephones used by the defendant and other conspirators during the period of the conspiracy. *See id*. at 3-4. It adds that defense counsel has also listened to recordings of telephone calls between the informant and the defendant regarding the controlled purchase that forms the basis for Count Six and reviewed a statement by a witness who provided detailed information regarding the conspiracy charged in Count One and the participants in it. *See id*. at 4.

The defendant protests, *inter alia*, that his counsel was not able to identify his voice on any recording or to have a copy of the recording to share with him, hampering his preparation of a defense and violating Federal Rule of Criminal Procedure 16(a)(1)(B). *See* Defendant Young's Reply Memorandum in Support of Defendant's Motion for Bill of Particulars (ECF No. 150) at 3. At oral argument, the government's counsel contended that there was no discovery violation because, in accordance with Rule 16, the defendant's counsel was permitted an "inspection" of the recording. He contended that, in any event, if the defendant believed that there was a discovery violation, he should have pressed that point separately rather than using it to bolster his motion for a bill of particulars.

The government has the better argument. As this court observed in denying a similar motion, a defendant "is not entitled by way of a bill of particulars to obtain details revealing the precise manner in which the government alleges that he committed the crimes charged or the manner in which it will attempt to prove the charges." *United States v. Faucette*, Criminal No. 2:13-CR-79-DBH, 2013 WL 3458182, at *1 (D. Me. July 9, 2013). "The purpose of a bill of

particulars is not to provide a defendant with discovery that otherwise would not be discoverable under the criminal rules and *Brady/Giglio*." *Id.*

The motion for a bill of particulars, accordingly, is denied.

## V. Conclusion

For the foregoing reasons, I recommend that the Motion To Suppress be **_GRANTED_** in part, with respect to all statements made by the defendant on March 11, 2014, other than his initial statement, and otherwise **_DENIED_**, and that the motions to dismiss be **_DENIED_**, and I **_DEEM_** the motions to sever **_MOOT_** without prejudice, to the extent that the defendant seeks severance of his trial from those of his co-defendants, and otherwise **_DENY_** them, and **_DENY_** the motion for a bill of particulars.

### _NOTICE_

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 1st day of September, 2014.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge